IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NICHOLAS FONTANA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 13 C 1888 |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| DR. KUL SOOD and DR. RENATO | ) | |
| DE LOS SANTOS, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Nicholas Fontana filed an amended one-count complaint against defendants Dr. Kul Sood and Dr. Renato De Los Santos, alleging that defendants were deliberately indifferent to his serious medical need in violation of 42 U.S.C. § 1983. Defendants have filed the instant motion for summary judgment pursuant to Fed. R. Civ. P. 56, contending that no genuine issue of material fact exists and that they are entitled to a judgment as a matter of law. For the reasons discussed below, defendants' motion for summary judgment is granted.

**BACKGROUND**[1]

Plaintiff was arrested on December 1, 2012, by the Carpentersville Police Department in connection with a bipolar episode. Plaintiff's then-girlfriend gave paramedics on the scene of

---

[1] The following facts are, unless otherwise specified, undisputed and come from the parties' Local Rule 56.1 statements and responses. However, plaintiff's responses to defendants' L.R. 56.1 statements contain improper answers. L.R. 56.1(b)(3) requires "a concise response to the movant's statement." Many of plaintiff's "concise" responses overflow with argument and factual assertions wholly unrelated to defendants' statements. This additional information will not be considered by the court. See, e.g., Stevo v. Frasor, 662 F.3d 880, 886-87 (7th Cir. 2011). The court reminds counsel that the purpose of L.R. 56.1 statements is to "identify the relevant admissible evidence supporting the material facts, not to make factual or legal arguments." Warner Bros. Entm't, Inc. v. Synergex Corp., No. 12-C-8483, 2014 WL 518085, at *1 (N.D. Ill. February 10, 2012).

the arrest a pill bottle with a prescription date from 2008, that was half-full with Zyprexa medication. Following his arrest, plaintiff was taken to Sherman Hospital where his medical records indicate that he tested positive for THC, was mildly intoxicated, and had previously been diagnosed with bipolar disorder. From the hospital, on December 2, 2012, plaintiff was taken to the Carpentersville Police Department. The police department property inventory form notes that plaintiff entered with a bottle of Zyprexa pills and hospital papers. An intake form indicates that plaintiff's medication was 15 milligram pills of Zyprexa and that plaintiff was currently being treated by a doctor in Elgin, Illinois.

Later that same day, plaintiff was transferred to the custody of the Kane County Adult Justice Center (the "jail"). Jail intake forms do not indicate that plaintiff had the pill bottle or hospital papers upon arrival. During initial booking at the jail, plaintiff tried to escape, after which he was placed in a restraint chair. Intake records note that plaintiff was very disoriented and classified him as an "Urgent/Emergent Mental Health Referral." Plaintiff was placed on "psych deadlock" until he could be evaluated by the jail's mental health personnel. Records also note that plaintiff had been diagnosed as bipolar, was "sweating and shaking," and very anxious.

On December 3, 2012, a mental health clinician employed by the jail conducted a mental health evaluation of plaintiff. The evaluation form indicates that plaintiff's primary care physician was in Elgin, Illinois, that his current medication was Zyprexa, which he had last taken two days prior, and that he used a Walgreens pharmacy in Carpentersville to fill his prescriptions. The form also indicates that plaintiff had previously used the medications Risperdal and Depakote to treat his bipolar disorder. The evaluation form notes that plaintiff was agitated and upset about the current circumstances and made threats to break objects and act

2

out. The clinician explained the availability of mental health services at the jail to plaintiff, but did not refer plaintiff for psychiatry, and recommended that he be placed in general population housing. Plaintiff told the mental health clinician that he had recently used alcohol and marijuana. Later that day, a clinical intern at the jail attempted to verify plaintiff's Zyprexa prescription with the Walgreens pharmacy plaintiff had identified, but was unable to do so.

Plaintiff submitted written requests to jail administrators on December 10 and December 12, 2012, concerning a cut on his right foot. Plaintiff also submitted a request on December 12, 2012, for a public defender. On December 19, 2012, a mental health clinician met with plaintiff following a request from a jail classification sergeant. According to notes from the meeting, plaintiff "reported feeling 'better' and presented [with] even affect." According to the notes, plaintiff "was calm/cooperative throughout conversation and actively participated." He was also alert, oriented, and agreeable to contacting mental health staff as needed. Plaintiff reported "utilizing positive coping skills such as drawing to help cope [with] incarceration."

On December 23, 2012, Dr. Sood, the jail's Medical Director, saw plaintiff for a small cut on his right foot. Plaintiff did not request any psychiatric medication from Dr. Sood, nor did plaintiff make any mental health complaints to Dr. Sood during the appointment.[2] On

---

[2] Defendants' L.R. 56.1 statement number 37 asserts that plaintiff "made no mental health complaints to Dr. Sood and did not make a request for psychiatric medication," during his December 23, 2012, appointment. Plaintiff's response admits that he did not request any medication, but "objects to 'made no mental health complaints' as vague and ambiguous." Because there is nothing "vague or ambiguous" about defendant's statement and plaintiff did not deny the statement, it is undisputed that plaintiff did not make mental health complaints to Dr. Sood during his December 23, 2012, appointment. See, e.g., McGuire v. United Parcel Serv., 152 F.3d 673, 675 (7th Cir. 1998) ("An answer that does not deny the allegations in the numbered paragraph with citations to supporting evidence in the record constitutes an admission.").

December 31, 2012, plaintiff made a written request for "a prescription for Zyprexa or something equivalent for bipolar disorder." That same day, plaintiff was seen by a jail mental health clinician. The medical progress notes from the appointment state that plaintiff "reported need to be back on meds." The notes also indicate that plaintiff was irritable, guarded, and paranoid, as well as spontaneously crying during the meeting. Plaintiff "appeared distraught over level of functioning in the community; i.e. problems [with] employment, relationship problems." The clinician's notes report that plaintiff "verbalized [a] positive response to Zyprexa in the community."

Following the evaluation, the clinician notified Dr. De Los Santos, the jail's psychiatrist, by phone of his meeting with plaintiff. Based on the clinician's observations, Dr. De Los Santos prescribed plaintiff Risperdal, a bipolar medication that is equivalent to Zyprexa, which was later administered to plaintiff. On January 2, 2013, a mental health clinician met with plaintiff per the request of a classification sergeant who reported that plaintiff was "acting strange and getting very close to other detainees." Medical progress notes from the meeting state that plaintiff "denied current [mental health] issues and reported [that] his med[ication] has been helpful." The mental health clinician reported plaintiff's status to Dr. De Los Santos via telephone, who discontinued plaintiff's Risperdal prescription and replaced it with an injectable form of Haldol, a long-acting antipsychotic medication. The parties dispute whether the Haldol medication was administered to plaintiff on January 2, 2013.

On January 3, 2013, plaintiff was found in his cell standing on a table with a wet t-shirt covering his head and face. A mental health clinician met with plaintiff that day to check his mental health status. During the meeting, plaintiff appeared paranoid and had to be "redirected

back to conversation." Plaintiff informed the clinician that he did not want to take the injectable form of Haldol, but was agreeable to take the medicine orally. After talking with plaintiff, the clinician "observed [him] sitting calmly on his bunk." The clinician notified Dr. De Los Santos of the plaintiff's status over the phone. Dr. De Los Santos discontinued the injectable prescription and prescribed an oral form of Haldol, which plaintiff took on January 3. Dr. De Los Santos also prescribed plaintiff Cogentin medication to help prevent side effects associated with Haldol.

A mental health clinician met with plaintiff again on January 4, 2013, for a mental health check. An officer reported to the clinician that plaintiff had torn his shirt and shoes up. When asked about this, plaintiff informed the clinician that he "was hungry and bored." Although plaintiff reported that he was not eating, the officer stated that plaintiff had eaten breakfast. Plaintiff also told the clinician that he was keeping the bread on his bunk for his chili later. The clinician reported that plaintiff was disheveled and stated that he would "shower if they let [him] out of this place." Plaintiff reported that his medicine and mood was "good."

Thereafter, mental health clinicians met with plaintiff on January 6, 7, and 9, 2013. Medical progress notes from these dates indicate that plaintiff was alert, oriented, calm, and cooperative. Plaintiff reported doing well on his current medication. The clinician educated plaintiff on the medicines he was taking. On January 9, the medical progress notes report that plaintiff "appeared stable at this time" and that psychiatric observations be discontinued.

Plaintiff was first seen by Dr. De Los Santos on January 11, 2013. Dr. De Los Santos' notes report that plaintiff had a history of psychiatric hospitalization and a bipolar diagnosis.

The notes indicate that plaintiff had a negative reaction to Risperdal, but a positive response to Haldol and Cogentin.  Plaintiff was alert and oriented during the meeting.

Medical progress notes from the jail show that plaintiff met with a mental health clinician on January 12, 2013, and February 7, 2013, after requesting to be seen.  On January 12, plaintiff reported that his mood was "good," and inquired about his jail classification.  Plaintiff refused to take his medications on February 6, 2013, and on February 7 reported getting limited sleep, anxiety, and feeling as if his "body is tired but mind is racing."  Plaintiff stated that he was otherwise "doing 'fine,'" and that he was "exercising and socializing to stay busy."  Plaintiff also told the clinician that he had previously taken Zyprexa medication and had liked it.  That same day, by telephone, Dr. De Los Santos discontinued plaintiff's oral prescription for Haldol and re-prescribed the injectable form of Haldol.

Mental health staff met with plaintiff on February 8, 2013, following an officer's report that plaintiff was hitting his head.  The staff member's notes report that plaintiff stated he was "feeling very anxious," could not sit still, and that his "body [felt] tired, but [he] can't shut [his] mind off."  Plaintiff reported that he had only slept approximately one hour each night for the last four days.  In regard to hitting his head, plaintiff stated that he "was sitting in the chair and it slipped and [he] hit his head on the lock of the door."  According to the mental health notes, plaintiff "did not display evidence of psychosis or paranoia," but had excessive energy.  The notes reflect that the staff member discussed with plaintiff that Dr. De Los Santos had adjusted his oral Haldol prescription to an injectable Haldol prescription, taken every three weeks.  Thereafter, plaintiff was given an injection of Haldol, "without incident."

Mental health staff met with plaintiff on February 9, 2013, for a mental health check. Notes from the meeting indicate that plaintiff reported "feeling 'a little' better since receiving shot," but was still anxious. He also reported that he had slept three-to-four hours the night before and felt more rested. On February 10, 2013, plaintiff refused to take his Cogentin medication. Plaintiff met with medical staff again on February 11, 2013, at which time he reported feeling less anxious and sleeping better. Plaintiff reported that he had stopped taking his Cogentin medication the day before, and that he started feeling better thereafter. The medical progress notes from the meeting indicate that plaintiff was educated on the purpose of taking the Cogentin and of his right to refuse to take any medication. Plaintiff agreed to take his Cogentin to prevent side effects from the Haldol medication.

Plaintiff was seen by a mental health clinician for a mental health check on February 12, 2013. According to the clinician's notes, plaintiff reported feeling better, less anxious since the injection, and denied having any thought processing impairments. The clinician noted that plaintiff's thoughts appeared "clear and concise" and that he "actively participated in the conversation." Plaintiff denied any sleep or appetite problems, neck or extremity stiffness, and any other side effects with his current medicines. Plaintiff was alert and oriented.

On February 14, 2013, plaintiff was examined by Dr. De Los Santos, who changed his bipolar medication from Haldol to Depakote. Dr. De Los Santos testified that he changed plaintiff's medication because during his February 14 meeting with plaintiff, plaintiff informed him that he had previously been prescribed Depakote and had a positive response to the medication. Plaintiff testified that his medication was switched because the Haldol medication

7

was causing negative side effects. Plaintiff was administered a dose of Depakote on February 15, 2013. Plaintiff remained on Depakote during the remainder of his time in the jail and was still taking the medication at the time defendants filed the instant motion.

A mental health clinician met with plaintiff on February 17, 2013, after officers at the jail reported that he was "acting strange" and was requesting to speak with mental health staff. One officer reported that plaintiff had been "slurring his words," and plaintiff complained of drooling, mostly when sleeping and sometimes while awake. The clinician's notes indicate that plaintiff did not appear to have difficulty talking and had a "clean speech pattern" during the meeting. Plaintiff reported some neck stiffness, but stated that he felt better since getting some sleep after a nurse and medical technician checked on him the night before. Following the clinician's meeting with plaintiff, Dr. Sood ordered that plaintiff be given two milligrams of Cogentin right away. Medical staff met with plaintiff again later that day, at which time he said he felt better, "but reported still experiencing dystonia (lock jaw) and drooling."

That same day plaintiff had a fellow prisoner type a grievance complaining about his medication and its negative side effects. Plaintiff testified that he was incapable of typing, could not concentrate, spell or sit, at the time the grievance was prepared. In the grievance, plaintiff complained that the mental health staff had "changed [his] medicine several times now as if [he] were a guinea pig to experiment on." He further stated that he had informed the mental health staff about the medicine he was taking prior to his arrest and that he had been functioning "quite well" when he was given the "proper medicine." Plaintiff noted that "the current level of treatment [he] is receiving is leaving [him] out of sync and uncomfortable." He stated that "the mental health staff must seek out the medicine [he] was taking before [he] came to this jail."

8

Records indicate that plaintiff met with mental health staff on February 20, 2013, at which time he reported "improvement in mood since changing medications" and that the side effects from his previous medication had been lessening each day. Plaintiff was alert and oriented during the meeting. Mental health staff met with plaintiff again on February 23, 2013, following his request to speak with them about a psychiatric evaluation for court. During the meeting, plaintiff described his mood as "good," and stated that his medications were also good as prescribed. Medical records from the jail also indicate that plaintiff was seen by medical staff on March 8, 2013, after plaintiff made a written request to be seen concerning his Cogentin prescription. Plaintiff inquired as to why he had not received his Cogentin medication the night before, and was told by the medical staff that his previous prescription was for a limited time period to address the side effects he reported having at the time. Plaintiff reported that he initially had side effects such as jaw tightness, but that he currently was not experiencing any side effects from his medications. Plaintiff was told to contact mental health staff if his side effects reappeared.

On March 16, 2013, plaintiff refused to take his Depakote because it made his "hands feel funny." Mental health staff met with plaintiff that same day following his verbal request to be seen. Plaintiff reported feeling shaky, and that he believed his Depakote prescription was too high. The medical notes indicate that plaintiff's most recent blood work was reviewed, showing a high level of Depakote. Plaintiff's dose of Depakote was ordered to be held pending a recommendation from the psychiatrist. Plaintiff was seen again by mental health staff on March 20, 2013, at which time he reported that the decreased dose of Depakote had "eliminated his shakiness." Plaintiff reported feeling "mentally stable" and happy with his current

9

medication regime. He denied any current mental health issues and denied the need to be seen by the jail psychiatrist. Plaintiff was released from jail in May 2013.

## DISCUSSION

**A.     Legal Standard**

A movant is entitled to summary judgment pursuant to Fed. R. Civ. P. 56 when the moving papers and affidavits show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. See Fed. R. Civ. P. 56(c); Becker v. Tenenbaum–Hill Assoc., Inc., 914 F.2d 107, 110 (7th Cir. 1990). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. See Green v. Carlson, 826 F.2d 647, 651 (7th Cir. 1987).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The nonmoving party must, however, "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252.

**B.     Analysis**

Although not entirely clear from the complaint, plaintiff's response to the present motion seems to articulate three ways in which defendants were allegedly deliberately indifferent to his medical needs in violation of his constitutional rights.  First, plaintiff alleges that defendants failed "to provide [him] *any* medical treatment for his bipolar disorder for the first month in which he was incarcerated." (Emphasis included.)  Second, plaintiff alleges that when defendants began treating his bipolar disorder they prescribed medications that caused adverse side effects.  Third, plaintiff alleges that despite defendants knowing he had been prescribed Zyprexa medication prior to his incarceration and despite his request for the medication, "at no time during his detention at [the jail] was he ever prescribed or given Zyprexa to treat his bipolar disorder."

Defendants first argue that they are entitled to summary judgment because the evidence establishes that plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA").  Plaintiff does not dispute that he did not exhaust his administrative remedies with respect to the claims in his complaint, but argues that this failure should be excused because his "medical condition and lack of medical care rendered him incapable of exhausting his administrative remedies in jail."  The court disagrees.

The Prison Litigation Reform Act of 1996 requires comprehensive administrative exhaustion.  Under that statute, "No action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail . . . until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); see also Massey v. Wheeler, 221 F.3d 1030, 1033-34 (7th Cir. 2000).  "[I]f a prison has an internal administrative grievance system

through which a prisoner can seek to correct a problem, then the prisoner must utilize that administrative system before filing a claim" under section 1983. Massey v. Helman, 196 F.3d 727, 733 (7th Cir. 1999).

Administrative remedies, however, cannot be exhausted where they are not available to the prisoner. See, e.g., Kincaid v. Sangamon, 435 Fed. Appx. 533, 536-37 (7th Cir. 2011) (unpublished). The Seventh Circuit has held that if circumstances could not possibly allow the prisoner to exhaust the institution's administrative remedies, then the remedies are not "available" within the meaning of the PLRA. See Hurst v. Hantke, 634 F.3d 409, 411-12 (7th Cir. 2011). As plaintiff points out, "physical incapacity to pursue the institution's administrative remedies renders those remedies unavailable for purposes of the PLRA." Richmond v. Dart, No. 11-C-65, 2012 WL 6138751, at *4 (N.D. Ill. Dec. 11, 2012).

Plaintiff argues that because he was "entirely untreated from December 2, 2012 to December 31, 2012," he was unable to exhaust the jail's administrative remedies to grieve his alleged lack of treatment during that time. According to plaintiff, the fact that "two different sergeants issued reports urging the mental health department" to see him and that a progress report from December 2012 indicated that he made paranoid and delusional statements during the meeting, establishes that he was unable to exhaust the jail's administrative remedies to during the first month of his incarceration.

The record, however, establishes that there is no material fact at issue regarding plaintiff's ability to grieve his complaints through the jail's administrative remedies in December 2012. In fact, plaintiff filed four written requests with jail administrators in December 2012. He grieved about the temperature of his cell on December 16 and made written requests about a cut

on his foot on December 10 and for a public defender on December 12, 2012. Further, on December 31, 2012, plaintiff made a written request for "Zyprexa or something equivalent for bipolar disorder." On that same day, plaintiff was seen by the jail's mental health staff and prescribed a bipolar medication equivalent to Zyprexa. Plaintiff took no further action concerning his request.

With respect to his failure to exhaust the jail's administrative remedies after December 2012, plaintiff argues that the side effects from his prescribed medications were so severe that he was left physically and mentally incapable of filing a grievance. Plaintiff argues that his continued delusions, as well as his reliance on another inmate to write both his February 17, 2013, grievance and March 5, 2013, complaint, support his claim of incapacitation. However, the record again is replete with examples of plaintiff utilizing the jail's administrative system and advocating on his own behalf during the remainder of his time in the jail. As defendants point out, plaintiff made numerous requests to jail administrators from January to March 2013. Plaintiff made written requests for issues unrelated to his mental health on January 1 and 20, February 23, March 7 and March 18, 2013. Plaintiff made a request through a jail computer kiosk on January 31, 2013, in regard to his left eye being irritated. Further, on March 7, 2013, plaintiff made a separate written request to the jail's mental health staff to speak to someone about his Cogentin prescription.

Even plaintiff's use of another detainee to help him file a grievance on February 17, 2013, evidences the availability of the jail's administrative process. Although plaintiff may not have been able to type the grievance himself, he was capable of requesting help from a fellow detainee and adequately articulating his complaints. Moreover, whatever ailments that may have

prevented plaintiff from typing his own grievance on February 17 dissipated by February 22, 2013, when he typed his own request to have a hard copy of his February 17 grievance. Plaintiff, however, failed to appeal this grievance through the jail's administrative process.

Given plaintiff's repeated use of the jail's administrative remedy system, his claim of physical incapacitation, which left him "unable to file grievances on his own behalf and exhaust his administrative remedies," is without merit.[3] There is no genuine issue of material fact with respect to whether the jail's administrative remedies were available to plaintiff between December 2012 and March 2013. Consequently, plaintiff's failure to exhaust the jail's administrative remedies bars his action from moving forward.[4]

### CONCLUSION

For the reasons stated above, the court grants defendants' motions for summary judgment and enters judgment in favor of defendants Dr. Kul Sood and Dr. Renato De Los Santos, and against plaintiff Nicholas Fontana.[5]

**ENTER:** October 9, 2015

**Robert W. Gettleman**
**United States District Judge**

---

[3] Johnson-Ester v. Elyea, No. 07-CV-4190, 2009 WL 632250 (N.D. Ill. March 9, 2009), does not persuade the court otherwise. In Johnson-Ester, the court held that the plaintiff, who suffered from severe multiple sclerosis, was physically and mentally unable to exhaust any administrative procedures. Id. at *9. Although the plaintiff had previously filed grievances, his condition had significantly worsened by the time at issue in the case. Id. at *1.

[4] "[E]xhaustion is a threshold issue that must be resolved by the district court judge prior to addressing the merits of the case." Johnson-Ester, 2009 WL 632250 at *1.

[5] The court expresses its appreciation to attorneys Michael Barry and Elizabeth Lopez, who represented plaintiff pursuant to their obligations as members of this district's trial bar.